Juyoun Han (*pro hac vice* to be filed)
Eric Baum (*pro hac vice* to be filed)
EISENBERG & BAUM, LLP
24 Union Square East, PH
New York, NY 10003
Tel: (212) 353-8700
Fax: (212) 353-1708

John K. Buche (CA Bar No. 239477) (Local Counsel)
Byron E. Ma (CA Bar No. 299706) (Local Counsel)
BUCHE & ASSOCIATES, P.C.
875 Prospect St., Suite 305
La Jolla, CA 92037
Tel: (858) 459-9111
Fax: (858) 430-2426
jbuche@buchelaw.com
bma@buchelaw.com

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| L.W., *minor child through her legal guardian Jane Doe, on behalf of herself and all others similarly situated,*<br><br>       *Plaintiff,*<br><br>  v.<br><br>SNAP INC., APPLE INC., and GOOGLE LLC,<br><br>       *Defendants.* | Civil Action No.: **'22CV0619 BEN RBB**<br><br>**COMPLAINT**<br><br>**[CLASS ACTION]**<br><br>**DEMAND FOR JURY TRIAL** |

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...................................................................................1

FACTS .......................................................................................................................2

L.W.'s Story ...........................................................................................................2

Snapchat Fosters A Sense of Impunity,  A Safe Haven For Child Sexual Abuse ...........7

Snap's CSAM Detection Technology is a Poor Fit for its platform and is Ineffective to Prevent Sexual Grooming ...................................................................8

Snap Falsely Represents that It Collects Multiple Data To Enhance User Safety. Instead, It Profits From User Data Collection and Illegal Activity on Its Platform. ......12

Apple's App Store and Google Play Promote, Participate, and Benefit from Apps that are Known to Facilitate CSAM Distribution, like Chitter. ..............................................15

Apple Builds Tools that Steer Users to Chitter, Develops Analytic Algorithms that Fail to Monitor App Quality, and Financially Benefits from Illegal Activity on Chitter ......17

Google Play Store Builds Tools that Steer Users to Chitter, Develops Analytic Algorithms that Fail to Perform Tasks to Monitor App Quality, and Benefits from Illegal Activity on Chitter ......................................................................22

PARTIES ................................................................................................................26

JURISDICTION AND VENUE .............................................................................27

CLASS ACTION ALLEGATIONS .......................................................................27

FIRST CAUSE OF ACTION : STRICT LIABILITY PRODUCT DESIGN AND DEFECT ...............................................................................................................32

SECOND CAUSE OF ACTION: NEGLIGENCE AND NEGLIGENCE PER SE PRODUCT DESIGN AND DEFECT ......................................................................35

THIRD CAUSE OF ACTION : CALIFORNIA BUSINESS AND PROFESSIONAL CODE §§17200 & 17500 ("UCL & FALSE ADVERTISING") ................................36

FOURTH CAUSE OF ACTION : FRAUDULENT MISREPRESENTATION & NEGLIGENT MISREPRESENTATION ...................................................................37

FIFTH CAUSE OF ACTION : UNJUST ENRICHMENT ....................................38

SIXTH CAUSE OF ACTION : INJUNCTIVE RELIEF ........................................39

SEVENTH CAUSE OF ACTION: TRAFFICKING VICTIMS PROTECTION ACT, 18 U.S.C. §§ 1591, 1595 et seq.) ..........................................................................40

PRAYER FOR RELIEF ..........................................................................................42

i

> **"We have been failed, and we deserve answers.**
>
> **Nassar is where he belongs, but those who enabled him deserve to be held**
>
> **accountable. If they are not, I am convinced that this will continue to happen**
>
> **to others across Olympic sports."**
>
> -   Simone Biles, Olympic Gymnast,
>
> *Testimony in Senate Hearing (September 15, 2021)*[1]

## PRELIMINARY STATEMENT

Plaintiff L.W., through her legal guardian Jane Doe and counsel Eisenberg & Baum,[2] LLP, on behalf of herself and all others similarly situated, brings this Complaint against Defendants Snap Inc., Apple Inc., and Google LLC. These claims arise from appalling online sexual grooming perpetrated by an adult against L.W., a child, over Snapchat, one of the most popular social media platforms in the country. The adult coerced and manipulated L.W. and many other children to send Child Sexual Abuse Material depicting themselves over the course of two-and-a-half years. To make matters worse, the adult then downloaded an application called Chitter and distributed those photos and videos to other adults. This adult has been convicted and sentenced for his crimes.

The claims alleged in this case are not against the adult perpetrator – they are against three major technology companies who enable him and others to commit these crimes. Plaintiff brings claims for violations of consumer protection laws, products liability torts, misrepresentations, and the Trafficking Victims Protection Act. The facts alleged focus on the data-driven tools that the Defendant companies develop and deploy by collecting troves of personal data from their users, ostensibly to protect minor users from egregious harm.

---

[1] Plaintiff and representatives have no known connections or affiliations to Ms. Biles whatsoever. The inclusion of this quote in this document is solely based on similarities of concerns bearing upon sexual abuse that have harmed minors which was brought to light by the powerful words of Ms. Biles, and to highlight the responsibility of perpetrators and enablers that is similarly addressed in this Complaint.
[2] Plaintiff's Counsel thanks student interns Paul Ingrassia (Cornell Law School, 3L) and Patrick K. Lin (Brooklyn Law School, 3L) for their contribution to this case and Complaint.

Yet, as experienced by L.W. and so many more, these tools and policies are more effective in making these companies wealthier than protecting the children and teens who use them.

Plaintiff and similarly situated class members demand that Defendants bring their services into compliance with laws that prohibit child sexual abuse and enforce their stated policies to eradicate such criminal conduct from their services. Plaintiff and similarly situated class members also demand that the Defendant companies redress the harm they have caused its users.

## FACTS

### L.W.'S STORY

1.   Minor child L.W. brings this class action through her legal guardian Jane Doe. From age 12 to 16, L.W. was repeatedly sexually groomed and abused on Snapchat.

2.   On or about September 5, 2018, L.W. was approached by a stranger, B.P., on Instagram. At the time, B.P. was an adult and L.W. was only 12 years old, soon to turn 13.[3]

3.   Following a brief conversation on Instagram, B.P. asked L.W. to connect on Snapchat.

4.   After they formed a Snapchat connection, B.P. began to chat with L.W. on Snapchat regularly.

5.   Upon belief, Plaintiff, a young child, did not expect that malicious actors would be on the Snapchat platform.

6.   Less than a week later, on September 11, 2018, B.P. demanded that L.W. send him a nude photograph of herself. When L.W. refused B.P.'s request, saying that she did not want to send him a nude photograph, B.P. responded with a photograph of himself, unclothed, and with an erect penis.

---

[3] In March 2019, Snap's executives admitted to UK lawmakers that its age-verification process is not effective. Snap also claimed at the hearing that Snap's web-cookies and inference signals are used for the purpose of actively determining a user's real age. *See* Ongudi, The Science Times, Snapchat Age Verification Tool May not Be Effective At Preventing Children From Accessing It (March 22, 2019), https://www.sciencetimes.com/articles/19015/20190322/snapchat-age-verification-tool-effective-preventing-children-accessing.htm

*L.W. v. Snap Inc. et al.* – COMPLAINT

7.   Over a period of two-and-a-half years, starting with the incident on September 11, 2018, and continuing until April 15, 2021, B.P. manipulated and coerced L.W. into sending him pornographic images and videos of herself over Snapchat. B.P. would ridicule and berate her if L.W. refused and would compliment her when she would comply.

8.   B.P. first asked L.W. for photos and videos in her underwear, then photos in the shower, and eventually photos and videos of L.W. depicting L.W.'s face and body, as well as exposed breasts and vaginal area. The videos include L.W. masturbating and penetrating her vagina with foreign objects at B.P.'s instructions and requests.

9.   These conversations, images and videos were explicit child sexual abuse material ("CSAM") depicting an apparent child's face and figure.

10.  Both the perpetrator, B.P., and victim, L.W., acknowledge that B.P. persistently and explicitly instructed L.W. to send those images and videos using verbal and photographic coercion on Snapchat's platform, over L.W.'s objections.

11.  Moreover, during the two-and-a-half-year period between September 2018 and April 2021, B.P. sent L.W. more than two hundred pornographic photos of his exposed penis and videos of himself masturbating and ejaculating. B.P. would then write sexually explicit messages on Snapchat to L.W., such as "lick this up."

12.  B.P. also tried to persuade L.W. to meet in-person at a hotel room or Airbnb to have sex, but L.W. refused.

13.  During the two-and-a-half-year period, there were multiple instances when L.W. blocked B.P. because she did not want to speak with him. However, B.P. would either contact L.W. through Instagram or a fake account and ask L.W. to reconnect with him on Snapchat again until she yielded to his request.

14.  At a formal investigation, B.P. admitted that he solely used Snapchat with L.W. – and not any other social media platform – to gain new CSAM and transmit his pornographic images and videos to her because he "kn[e]w the chats will go away" on Snapchat.

15.  L.W. was not B.P.'s only victim. B.P. used Snapchat to obtain photographs and videos of CSAM by connecting with other minor children during the same time, in different

3

states across the country. Many of these photos and videos transmitted over Snapchat expose the face and nude body of apparent minor children. B.P. also maintained a constant line of sexually explicit communication with minors over Snapchat.

16.  One example of B.P.'s Snapchat dialogues, quoted below, explicitly mentions the age of the minor victim (other than L.W.) followed by CSAM transmission:

> B.P.: "Age?"
>
> Underaged Child: "Going to be 14"
>
> B.P.: "Bikini pic?"
>
> B.P.: "Snap me"
>
> B.P.: "Send more tit videos?"
>
> B.P.: "I'm older. I'm 20"
>
> B.P.: "I mean it doesn't really matter now tho. No one will know."
>
> B.P.: "N[ot] G[onna] L[ie] id still definitely fuck u"
>
> B.P.: "Pound t[he] f[uck] outta both your tight holes."

17.  B.P.'s patterned behavior of exploiting minors includes sexually explicit conversations revealing the minors' geographic location, age, and photos and videos containing CSAM.

18.  B.P.'s exchanges of CSAM with L.W. and multiple other underaged children began in 2018 and continued until May 2021. B.P. did not stop until he was subject to criminal investigation.

19.  During this time, B.P. was living and located in the barracks of Marine Corps Base Camp Pendleton in California.

20.  After coercing underaged children to produce and transmit CSAM on Snapchat, B.P. then utilized another application called Chitter which allows strangers to connect and send anonymous messages and exchange photos and videos. Chitter is known to be used primarily for CSAM distribution.

21.  B.P. indicated that he uses Chitter to seek out Dropbox links which contain nude photos and videos of "teenagers."

4

22.   B.P. and another Chitter user with the account name "Trade Pics of F's" connected on Chitter and traded CSAM depicting Plaintiff and other minor children. For example, B.P. and the Chitter user with the account name "Trade Pics of F's" makes blatantly clear that they were exchanging CSAM depicting children under the age of 16. B.P.'s Chitter dialogues included their victims' age, as well as photos and videos:

B.P.: "Got any underage?"

Trade Pics of Fs: "Yuh. H[ow] b[out] [yo]u."

B.P.: "Yuh lemme see"

[More CSAM transmitted and exchanged]

Trade Pics of Fs: "Those both are"

[More CSAM transmitted and exchanged]

B.P.: "I got a 14 yr old"

Trade Pics of Fs: "Yea send all"

[More CSAM transmitted and exchanged]

B.P.: "Shes 14"

[More CSAM transmitted and exchanged including depictions of L.W.]

B.P.: "any Vids" [More CSAM transmitted and exchanged]

Trade Pics of Fs: "She's 15 . . . and the top is 14"

[More CSAM transmitted and exchanged]

B.P.: "any pussy"

. . .

23.   On May 24, 2021, B.P. was investigated for his actions and charged with various crimes perpetrated against L.W. and other victims including Sexual Abuse of a Child involving Indecent Exposure; Production of Child Pornography; Distribution of Child Pornography; and Possession of Child Pornography. He pled guilty to these crimes.

24.   B.P.'s used Snapchat and Chitter to commit sexual crimes against underaged children like L.W.

25.   During the years when L.W. was being sexually groomed on Snapchat by B.P.,

5

L.W. was unable to tell anyone about it. Enduring the pain alone, L.W. suffered various physical and psychological harms including depression, anxiety, self-harm, and multiple suicide attempts.

26.    Due to the physical and psychological harms, L.W. was assessed at a teen suicide outpatient program, and even an emergency room after a suicide attempt. She sought care from a personal therapist, psychiatrist, and was prescribed antidepressants.

27.    In or around May 2021, L.W. was able to tell her mother about the two-and-a-half years of abuse she suffered by B.P.'s conduct on Snapchat.

28.    L.W. suffered and continues to suffer from embarrassment, shame, guilt, and fear related to her experience involving B.P.

29.    Because images and videos of her have been distributed on Chitter App, and these are not retractable, L.W. faces constant anxiety and fear that those CSAM are continuing to be spread and watched.

30.    In addition, L.W. is constantly tormented by the fact that such CSAM have the potential of resurfacing at any point in her life and used against L.W.

31.    L.W. stated that her 12-year-old self could have never foreseen this and that had she known what would transpire, she would have ended her life before it got this bad.

32.    At night L.W. lies awake feeling anxious, only falling asleep when she cannot keep her eyes open any longer.

33.    L.W. has lost all trust in men since these traumatic events. She believes it will take her much effort and countless hours of therapy to restore trust in dating relationships and to enjoy a level of general security.

34.    B.P.'s sexual grooming and abuse of L.W. on Snapchat continues to have corrosive effects on L.W. internally – most harrowingly of all, L.W. has said the pain "is killing me faster than life is killing me."

35.    L.W. believes she is likely to use Snapchat and Defendants' app stores in the future because they are so integral to modern life where mobility and communication has become integral.

**SNAPCHAT FOSTERS A SENSE OF IMPUNITY,  A SAFE HAVEN FOR CHILD SEXUAL ABUSE**

36.   Snap Inc. ("Snap") is the parent company of Snapchat, a widely popular photo sharing application ("app"), which is used by hundreds of millions of people globally with net annual revenues that exceed $4 Billion.[4]

37.   Snapchat's popularity among teenagers surpasses other major social media platforms like Twitter and Facebook.[5] The average user spends over 30 minutes of time per day on Snapchat.[6]

38.   Snapchat integrates several unique features that make it stand out from its competitors. First, Snapchat messages disappear from the interface after one reads it ("ephemeral messaging function"). This generates a sense of impunity for many Snapchat users, opening the doors for exploitation and predatory behavior, a fact that has been observed in multiple empirical studies of frequent users. [7]

39.   According to studies, Snapchat users believe that their conduct would be hidden and accordingly feel more empowered to engage in criminal behavior on Snapchat without fear of getting caught.[8] This sense of impunity fostered by ephemeral messaging is confirmed by predators like B.P. who openly admitted at his criminal investigation that he only used Snapchat with his victims because he "kn[e]w the chats will go away."

---

[4] *Global revenue of Snap from 1st quarter 2015 to 4th quarter 2021 (in million U.S. dollars)*, STATISTA, https://www.statista.com/statistics/552694/snapchat-quarterly-revenue/.
[5] Monica Anderson & Jingjing Jiang, *Teens, Social Media & Technology 2018*, PEW RESEARCH CENTER (May 31, 2018), https://www.pewinternet.org/wp-content/uploads/sites/9/2018/05/PI_2018.05.31_TeensTech_FINAL.pdf.
[6] *Snapchat by the Numbers: Stats, Demographics & Fun Facts*, OMNICORE (March 2, 2022), https://www.omnicoreagency.com/snapchat-statistics/#:~:text=On%20average%2C%20people%20spend%20over%2030%20minutes%20on%20Snapchat%20and%20send%2034.1%20messages%20a%20day.
[7] *Id* at 109.
[8] *See*, e.g., Leah Moyle, et al., *#Drugsforsale: An exploration of the use of social media and encrypted messaging apps to supply and access drugs*, 63 INTERNATIONAL JOURNAL OF DRUG POLICY (Jan. 2019), https://doi.org/10.1016/j.drugpo.2018.08.005.

7

40.   Moreover, Snapchat's ephemeral messaging function furnishes a level of intimacy between users.[9] Critically, Snapchat's disappearing messaging is intended to entice users to share highly personal photos and information that many users would otherwise feel uncomfortable sharing on "higher-stake" apps such as Instagram."[10]

41.   Also, because of these designs, users perceive Snapchat to have less formal interactions than other social media, studies have also found that the "close ties" generated between teenagers on the app foster the conditions for social grooming and other predatory behavior.[11]

### SNAP'S CSAM DETECTION TECHNOLOGY IS A POOR FIT FOR ITS PLATFORM AND IS INEFFECTIVE TO PREVENT SEXUAL GROOMING

42.   Sexual grooming is different from CSAM distribution of in several aspects. Sexual grooming involves a 1:1 relationship built through "a process of exploiting trust to shift expectations of what safe behavior is and leveraging fear and shame to keep a child silent."[12] According to Thorn, the organization that tackles the problems of CSAM, "[g]rooming relies on exploiting insecurities and trust, and in an online setting trust can be built through a variety of methods. Children are able to build new relationships that are completely decontextualized from every other aspect of their lives. Any content produced as a result of grooming can then be used to threaten and blackmail a child, playing on a child's fear of getting in trouble, to force the victim into performing more acts which can

---

[9] *See* Evelyn Lopez, et al., *The Gratifications of Ephemeral Marketing Content, the Use of Snapchat by the Millennial Generation and Their Impact on Purchase Motivation*, GLOBAL BUSINESS REVIEW (2021), https://journals.sagepub.com/doi/pdf/10.1177/09721509211005676.

[10] *See id.*

[11] *See* Vivek K. Singh, et al., "*They basically like destroyed the school one day": On Newer App Features and Cyberbullying in Schools*, RESEARCHGATE – Conference Paper (Feb. 2017), https://wp.comminfo.rutgers.edu/vsingh/wpcontent/uploads/sites/110/2020/02/CSCW_CameraReady_Singh_Radford.pdf.

[12] *Online Grooming: What it is, How it Happens, and How to Defend Children*, THORN, https://www.thorn.org/blog/online-grooming-what-it-is-how-it-happens-and-how-to-defend-children/

*L.W. v. Snap Inc. et al.* – COMPLAINT

become increasingly explicit."[13]

43.   At all relevant times, the dangers and prevalence of online child sexual grooming have been well-known to tech giants like Defendants.

44.   In November 2019, a bipartisan group of Senators sent a letter to 36 leading tech companies, including Snapchat, Apple, Inc. ("Apple") and Google LLC ("Google"). In the letter, a Senate Committee asked questions specifically addressing online sexual grooming of children and CSAM detection technologies, including: [14]

- What measures have you taken to ensure that steps to improve the privacy and security of users do not undermine efforts to prevent the sharing of CSAM or stifle law enforcement investigations into child exploitation?

- Have you implemented any technologies or techniques to automatically flag CSAM that is new or has not been previously identified, such as the use of machine learning and image processing to recognize underage individuals in exploitative situations?

- If your platform(s) include a search engine, please describe the technologies and measures you use to block CSAM from appearing in search results.

- What, if any, proactive steps are you taking to detect online grooming of children?

45.   In July 2020, ParentsTogether, a national parent group, delivered a petition from 100,000 parents to Snap demanding that the company do more to "protect children from

---

[13] *Id.*

[14] *Letter to Sundar Pichai and 36 other Tech Companies by Senate Committee* (November 18, 2019), https://www.blumenthal.senate.gov/imo/media/doc/11.18.19%20-%20Google%20-%20CSAM.pdf

9

grooming, sexual abuse, and exploitation on Snapchat."[15]

46.   The petition flagged examples of widespread online sexual grooming of children including:

- *A high school coach in New Mexico used Snapchat to extort sexual videos from several girls as young as 14.*

- *A Cleveland man posed as a therapist and blackmailed a 13-year-old girl into sending him sexual videos and photos.*

- *A Virginia man was arrested for running a "sextortion" ring on Snapchat, coercing children into sending sexually explicit material.*

47.   In response, Snap announced that it would adopt Google's Child Sexual Abuse Imagery Match (hereinafter "CSAI Match") technology in addition to Microsoft's Photo DNA to scan videos for child pornography by Fall 2020.[16]

48.   However, CSAI Match and PhotoDNA are ineffective when it comes to preventing child sexual grooming. This is because sexual grooming generates new CSAM that would not have been previously identified.[17] Because these CSAM are new when produced and distribute over Snapchat, they would not "match" previously known CSAM in an existing database.

49.   Simply put, the CSAI Match and PhotoDNA match chops the potentially problematic photo or video frame (numerous photos) into a string of numbers (hence,

---

[15] Snapchat: Prevent Pedophiles from Sharing Abuse Videos, https://parents-together.org/snapchat-petition/

[16] *Our Transparency Report for the First Half of 2021*, SNAP INC. (Nov. 22, 2021), https://snap.com/en-US/safety-and-impact/post/our-transparency-report-for-the-first-half-of-2021.

[17] *Voluntary Principles to Counter Online Child Sexual Exploitation and Abuse*, DEPARTMENT OF JUSTICE, https://www.justice.gov/opa/press-release/file/1256061/download (accessed on March 28, 2022).

likened to a DNA). Then, it compares those numbers to the database of previously flagged CSAM photos and videos that are also chopped down to a string of numbers. If there is a match, then the model would determine that the photo or video frame is CSAM material.[18]

50.    Snap states that it is "using CSAI Match technology to identify *known* illegal images and videos of CSAM and report them to the National Center for Missing and Exploited Children (NCMEC)."[19]

51.    Upon information and belief, CSAM detection technology like PhotoDNA and CSAI Match is thus a poor fit to prevent sexual grooming on Snapchat. First, sexual grooming results in the production of new, previously unknown CSAM material that lacks a reference point for a match in any database, hence, PhotoDNA and CSAI Match would not be helpful. Second, because the newly produced CSAM material does not match anything in the existing database, Snap's enforcement relies upon reports form individual users who have been harmed, an inherently reactive approach that waits until a child is harmed and places the burden on the child to voluntarily report their own abuse.

52.    Moreover, even in detecting CSAM that has been previously known and identified in a database, social media companies like Snap. that operate at major scale with "billions of daily uploads" may prioritize factors like "efficiency" (*i.e.*, cost and scalability) and "distinctness" (*i.e.*, more specificity) while compromising other factors like "tolerance" (*i.e.*, less specificity) of the detection model, potentially resulting in under-reporting of actual incidents of CSAM distribution.[20]

---

[18] This is a process called "hashing." For a fuller explanation, *see* Hany Farid, An Overview of Perceptual Hashing, Journal of Online Trust and Safety (October 2021) at 2-3, Stanford Internet Observatory, https://tsjournal.org/index.php/jots/article/download/24/14

[19] *NCMEC, Google and Image Hashing Technology*, GOOGLE, https://safety.google/intl/en_nz/stories/hash-matching-to-help-ncmec/ (accessed on March 28, 2022).; *Our Transparency Report for the First Half of 2021*, SNAP INC. (Nov. 22, 2021), https://snap.com/en-US/safety-and-impact/post/our-transparency-report-for-the-first-half-of-2021.

[20] *See* Hany Farid, An Overview of Perceptual Hashing, Journal of Online Trust and Safety (October 2021) at 10, Stanford Internet Observatory, https://tsjournal.org/index.php/jots/article/download/24/14 "In practice, the choice of a hash is based on a number of factors, including: 1. Scale. When operating at the scale of a major social media platform, for example, with billions of daily uploads, any hash must be highly efficient and distinct. At this scale, even a 1/100 or even 1/10,000 false positive rate (incorrectly

**SNAP FALSELY REPRESENTS THAT IT COLLECTS MULTIPLE DATA TO ENHANCE USER SAFETY. INSTEAD, IT PROFITS FROM USER DATA COLLECTION AND ILLEGAL ACTIVITY ON ITS PLATFORM.**

53.     Snap collects troves of information and data from its users.[21] According to Snap, users "provide us whatever information you send through our services, such as Snaps and Chats."[22]

54.     Information Snap obtains when users use their services include the following: (1) usage information (how the user communicates with other users, such as their names, the time and date of any communications);[23] (2) content information (whether the user viewed content, and meta data "information about a Snap and Chat such as the date, time, sender, and receiver.");[24] (3) device information; (4) device phonebook; (5) camera and photos; (6) precise location information; (7) information collected by cookies and other technologies; and (8) log information.[25]

55.     Snap claims to use this information for a variety of purposes, including to: (1) "enhance the safety and security of our products and services"; (2) "verify your identity and prevent fraud or other unauthorized or illegal activity"; and (3) "enforce, investigate,

---

matching two images) is untenable. 2. Tolerance. When trying to limit the upload of, for example, legal adult pornography, resilience may be less important than, for example, trying to limit child sexual abuse imagery (CSAM). . . ."

[21] Snap uses information it collects for many different purposes, including "provide and improve our advertising services, ad targeting, and ad measurement, including through the use of your precise location information (again, if you've given us permission to collect that information), both on and off our services." Snap Inc., *Privacy Policy*, SNAP INC. (Nov. 17, 2021), https://www.snap.com/en-US/privacy/privacy-policy.

[22] *Id.*

[23] *Id. Snap's privacy policy states that it collects information about "how you communicate with other Snapchatters, such as their names, the time and date of your communications, the number of messages you exchange with your friends, which friends you exchange messages with the most, and your interactions with messages (such as when you open a message or capture a screenshot)."*

[24] *Snapchat Support: Snap and Chat Metadata*, SNAP INC., https://support.snapchat.com/en-US/article/snap-chat-metadata (accessed on March 28, 2022).

[25] *Id.*

and report conduct violating our Terms of Service and other usage policies, respond to requests from law enforcement, and comply with legal requirements."[26]

56.   The troves of data and information about its users would enable Snap to detect and take actions to prevent instances of grooming and CSAM distribution, but Snap has failed to do so.

57.   Yet, Snap continues to make false representations that "[w]e report all instances of child sexual exploitation to authorities." This is untrue.

58.   The following is on Snapchat's Community Guidelines that outline the Terms of Service:

> The key is the spirit of these rules: we want Snapchat to be a safe and positive experience for everyone. We reserve the right to decide, in our sole discretion, what content violates that spirit and will not be permitted on the platform.
>
> **Sexually Explicit Content**
> We prohibit accounts that promote or distribute pornographic content. We report all instances of child sexual exploitation to authorities.
>
> Never post, save, or send nude or sexually explicit content involving anyone under the age of 18 — even of yourself. Never ask a minor to send sexually explicit content.

59.   As L.W.'s experience clearly demonstrates, Snap/Snapchat does not report all instances of child sexual exploitation to authorities, and has clearly exercised its purported "right to decide in their sole discretion" not to do so.

60.   According to their Terms of Service in place on September 26, 2017, February

---

[26] *Privacy Policy*, SNAP INC. (Nov. 17, 2021), https://www.snap.com/en-US/privacy/privacy-policy.

18, 2019, and from October 30, 2019 until September 30, 2021, Snap clearly gives themselves permission to monitor, filter, and moderate user content at "any time for any reason."

- While we're not required to do so, <u>we may access, review, screen, and delete your content at any time and for any reason, including to provide and develop the Services or if we think your content violates these Terms.</u> You alone, though, remain responsible for the content you create, upload, post, send, or store through the Service.[27]

61.    Snap wields a great deal of discretion, specifically with respect to moderating, screening, and deleting user content.

62.    Snap's purported justification for collecting valuable user data is to enhance security, detect illegal activity, and enforce community guidelines against violators. But, contrary to their representation, Snap's goal of collecting user data is not for user security and protection from illegal activities. Instead, Snap collects user data for advertisement purposes, which it openly profits from while many of its users are exposed to unsafe and unprotected situations on its app.

63.    Snap also collects user data which translates into advertisement profit, <u>in consideration</u> for (which is the legal contract speak for "trading value for") users to access the platform.[28]

- The Services may contain advertisements. <u>In consideration for Snap Inc. letting you access and use the Services, you agree that we, our affiliates, and our third-party partners may place advertising on the Services.</u>

---

[27] https://snap.com/en-US/terms (versions September 26, 2017, February 18, 2019, and October 30, 2019)

[28] *See* Opp. To Motion to Dismiss by Plaintiffs' attorney, Lee Davis in *BAILEY ZIENCIK, ET AL. 'S MEMORANDUM OF POINTS & AUTHORITIES IN OPPOSITION TO SNAP, INC'S MOTION TO DISMISS PLAINTIFFS' COMPLAINT*, Case No.: 2:21-cv-7292-DMG-PD (C.D.Cal) Doc 50-1 (11/19/21)

14

> Because the Services contain content that you and other users provide us, advertising may sometimes appear near your content.

64. Perpetrators like B.P. are in a continuous business relationship with Snap Inc. Snap provides users like B.P. access to Snapchat platform in exchange for collecting user data which translates into advertisement profit.

65. Snap gains $31 in average revenue for every daily user on Snapchat platform in North America.[29] Because each user (and their data) is worth money, Snapchat benefits financially from users committing sexual crimes against children on its platform.

66. By engaging in unfair, deceptive business practices as described above, and by enabling sexual predators to perpetrate crimes against minor children while financially benefitting from the same, Snap has caused severe harm to Plaintiff L.W. and putative Class members.

## APPLE'S APP STORE AND GOOGLE PLAY PROMOTE, PARTICIPATE, AND BENEFIT FROM APPS THAT ARE KNOWN TO FACILITATE CSAM DISTRIBUTION, LIKE CHITTER.

67. Plaintiff brings claims against Apple and Google for enabling, recommending, and steering users on Apple's App Store ("App Store") and Google's Play Store ("Google Play") to the Chitter, which was used by B.P. to distribute CSAM depicting L.W.

68. Chitter is an application that connects two random users at which time and allows the transmission of anonymous messages, photos, and videos.

69. Chitter has gained notoriety for attracting users who seek to trade CSAM.

70. On Chitter, B.P transmitted Plaintiff's photos and videos that contain CSAM to other users, and received other CSAM in exchange.

---

[29] Average Revenue Per User - April 2022 Investor Presentation at 35, Snap Inc., Q1 2022 Investor Deck (q4cdn.com)

71.     According to Google Play and Apple's App Store, Chitter is developed by a company listed as "Chitter.to Inc." which, upon information and belief, is a company located and operated from outside of the U.S.

72.     Chitter is readily downloadable by users within the United States through Google Play and Apple's App Store. [30]

73.     Chitter sells in-app products to users for $4.99 to $48.99 per item.



*[Image: Chitter App on Google App Store]*

74.     Chitter is not a Defendant in this action. Plaintiff is bringing an action against Apple and Google for enabling, recommending, and steering users to Chitter. Apple and Google have engaged in continuous business relationships with, and financially benefitted from, Chitter being sold on the respective digital marketplaces.

---

[30] Chitter on Google Play Store, https://play.google.com/store/apps/details?id=chitter.anonymous.chat; Chitter on Apply App Store, https://apps.apple.com/us/app/chitter-anonymous-chat/id1437897677

16

### APPLE BUILDS TOOLS THAT STEER USERS TO CHITTER, DEVELOPS ANALYTIC ALGORITHMS THAT FAIL TO MONITOR APP QUALITY, AND FINANCIALLY BENEFITS FROM ILLEGAL ACTIVITY ON CHITTER

75.    Apple's App Store is a digital distribution platform where individuals can buy and download digital software and applications. The platform is operated and developed by Apple.

76.    More than half a billion users access the App Store each week.

77.    In 2021, Apple is estimated to have generated $85.1 billion in gross app revenue globally.[31]

78.    Apple charges a 30 percent commission to apps on App Store sales, including in-app purchases and subscriptions.[32] In November 2020, Apple introduced the App Store Small Business Program, which cut the commission rate to 15 percent for all developers making less than $1 million per year.[33]

79.    Chitter is an app that sells in-app products ranging "$4.99 - $48.99 per item." Apple benefits from a commission from these in-app sales.[34] In this way, Chitter and Apple maintain a continuous business relationship, and Apple gains financial benefit from Chitter's activities.

80.    When a user launches the App Store application on their device, the user is informed of the guidelines, terms of service, and privacy policy through a pop-up notification window that the user is prompted to read and click "OK" before the user can

---

[31] L. Ceci, *Worldwide gross app revenue of the Apple App Store from 2017 to 2021*, STATISTA (Dec. 13, 2021), https://www.statista.com/statistics/296226/annual-apple-app-store-revenue/.
[32] Ryan Daws, *Apple vows to collect App Store commission even through alternative payment systems*, DEVELOPER (Jan. 18, 2022), https://www.developer-tech.com/news/2022/jan/18/apple-vows-collect-app-store-commission-alternative-payment-systems/.
[33] *Apple, US developers agree to App Store updates that will support businesses and maintain a great experience for users*, APPLE (Aug. 26, 2021), https://www.apple.com/newsroom/2021/08/apple-us-developers-agree-to-app-store-updates/.
[34] https://play.google.com/store/apps/details?id=chitter.anonymous.chat

access the Store.

81.    Apple's App Store's Policy overtly informs consumers that Apple is managing and gaining information about users and their interaction with apps sold on the App Store from users' input: "To make better recommendations, we . . . aggregate information about app ratings."[35]

82.    Apple's App Review Guidelines go on to say the company is "keeping an eye out for kids," it will "reject apps for any content or behavior that we believe is over the line," and that apps are required to have protective measures for filtering out anonymous content and abusive users.[36]

---

[35] Apple App Store & Privacy, https://www.apple.com/legal/privacy/data/en/app-store/
"Personalizing the Stores: We use your interactions with the App Store to help you discover the content that's most relevant to you. For example, we recommend content that we think will be of interest to you based on what you've previously searched for, viewed, downloaded, updated, or reviewed in the App Store. We also use your purchase history, including in-app purchases, subscriptions, and payment methods together with account information derived from your Apple ID. To make better recommendations, we also use aggregate information about app launches, installs, and deletions from users who choose to share device analytics with Apple and aggregate information about app ratings. The App Store uses local, on-device processing to enhance our recommendations. Using app usage data stored on your device — such as the apps you frequently open, the time you spend using certain apps, and your app installs and uninstalls — the App Store can suggest apps and in-app events that are more relevant to you. The information Apple receives about your usage of the stores includes information about the personalized content you tap and view."

[36] App Store Review Guidelines, https://developer.apple.com/app-store/review/guidelines/
"So know that we're keeping an eye out for the kids.
We will reject apps for any content or behavior that we believe is over the line. What line, you ask? Well, as a Supreme Court Justice once said, "I'll know it when I see it". And we think that you will also know it when you cross it.
1.1.4 Overtly sexual or pornographic material, defined by Webster's Dictionary as "explicit descriptions or displays of sexual organs or activities intended to stimulate erotic rather than aesthetic or emotional feelings."
Apps with user-generated content present particular challenges, ranging from intellectual property infringement to anonymous bullying.
To prevent abuse, apps with user-generated content or social networking services must include:
A method for filtering objectionable material from being posted to the app
A mechanism to report offensive content and timely responses to concerns
The ability to block abusive users from the service
Published contact information so users can easily reach you Apps with user-generated content or services that end up being used primarily for pornographic content, Chatroulette-style experiences, objectification of real people (e.g. "hot-or-not" voting), making physical threats, or bullying do not belong on the App Store and may be removed without notice. If your app includes user-generated content from a web based

18

83.    Users of the App Store have posted the following reviews and ratings regarding Chitter on the App Store page:

- "It seems and tho 99 percent of the females are under 18 . . . there are a lot of creeps here. Especially looking to chat up underage girls."

- "they're sooo many pedophiles and s[e]x addicts. . . the app needs to be more aware of these types of people because grooming toward minors does exist. I'm a victim of it. I would hate for a child to stumble on the app"

- "all of the users that had their age as a display were underage . . . this is a pedophillic rats nest and should be shut down immediately."

- "something traumatic happened for me on this app, a user trying to send me underaged photos of children. I was terrified and disgusted."



✕

★★★☆☆

████   09/13/2020

**Good at first but...**
Hi. Let's start with the good. It supports txt, voice messages, send self destructing pics and vids, and voice calls. You need to subscribe if your looking to chat specific a specific gender. This app has a lot of people a month ago. Now, it seems and tho 99 percent of the females are under 18. No matter what time of day or night the ladies are sub 18 and waiting for an adult can be an eternity orExercise in futility. There seems to be countless men here so to me either there are too few adult women or the ratio to adult men/women is disappointingly in favor of men. I guess that's a plus for women but I must warn the good men and women that there are a lot of creeps here. Especially looking to chat up underage girls. Lots women sellers trying to sell "their" pics and vids over cashapp.

---

service, it may display incidental mature "NSFW" content, provided that the content is hidden by default and only displayed when the user turns it on via your website."

*L.W. v. Snap Inc. et al.* – COMPLAINT



★★☆☆☆

███████████████, 03/22/2022

**L app**

I've been on there for a min (2 years ish) so I think it's fair I give a review. First of all the concept of this app is really good. The whole anonymous thing and being able to call is nice for when you're bored.

Now the part of the app that is not good is that lie obvious fact that they're sooo many pedophiles and s3x addicts. I called out a guy who's name was "male 4 F11+" and simply for adding my own curse words (not directed towards the guy) I got blocked out for 9 hours. The app needs to be more aware of these types of people because grooming toward minors does exist. I'm a victim of it. I would hate for a child to stumble on the app and think it's all fun nd games because they're bored.

Overall the app is pretty cool once you take the COUNTLESS of perverts and pedophiles out of it. Some people I've met are actually down for a conversation rather than other things.

★☆☆☆☆

████████ 11/13/2020

**Not cool man.**

So I decided to give this app a try.... I was looking for something simple. Most social apps these days are very deceiving these days, it is what it is. But I wanted a change of pace and this is what I found. I wasn't surprised that you would have to pay for a gender preference option. But when I got into the chats all of the users had either their age and sex. Or something very sexually explicit, okay fine. But all of the users that had their age as a display were underage. So I decided to see what was up and get my troll on. They were all very forward and did not seemed concerned with the age of the person they were talking to. I have seen some messed up stuff on as far as the internet goes but this is the only thats actually made me scared. If I didn't say something and heard about something happening on the news because of this. I wouldn't be able to live with myself. This is a pedophilic rats nest and should be shut down immediately. -My inner Karen

*L.W. v. Snap Inc. et al.* – COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12



13      84.     Apple also develops and maintains a recommendation tool that steers

14   its App Store users to Chitter. For example, when a user is browsing an app that is

15   related to anonymous chats and dating apps, the App Store may recommend Chitter

16   to a user by displaying it on the "You Might Also Like" section steering App Store

17   users to download Chitter.

18
19
20



21
22
23
24
25
26
27
28

21



85.    Although Apple overtly represents that it has an analytics system in place that collects user input and ratings and "keeping an eye out for kids"; concretely states it would reject apps that perpetuate child abuse and sexually explicit conduct; and despite its awareness of reviews posted on the App Store that try to warn, inform, and elevate individual concerns about CSAM and child sexual exploitation on the Chitter app, Apple continues to sell and recommend the app to users.

86.    All the while, Apple derives financial benefit and has a continuous business relationship with Chitter by taking commission from Chitter's in-app purchases and by gaining data from Apple's users that it collects for advertisement and data revenue.

**GOOGLE PLAY STORE BUILDS TOOLS THAT STEER USERS TO CHITTER, DEVELOPS ANALYTIC ALGORITHMS THAT FAIL TO PERFORM TASKS TO MONITOR APP QUALITY, AND BENEFITS FROM ILLEGAL ACTIVITY ON CHITTER**

87.    Google Play, also branded as the Google Play Store, is a digital distribution platform where individuals can buy and download digital software and applications. The platform is operated and developed by Google. Approximately 71 percent of all smartphone users are on the Android operating system, which gives them access to Google Play. More than 1 billion users use Google Play, making it a leading app store.

88.    As of January 1, 2022, Google Play has two tiers of service fees that it charges

app developers for in-app products.[37]

89.    A 15 percent commission is charged to small app developers for the first $1 million of earnings each year, and a 30 percent commission is charged to large app developers for earnings more than $1 million.[38]

90.    Google also charges a one-time fee of $25 to become a Google Play developer, which allows the developer to publish apps on the platform.

91.    Chitter is an app that sells in-app products ranging "$4.99 - $48.99 per item." Google benefits from a commission from these in-app sales. In this way, Chitter and Google Play maintain a continuous business relationship, and Google gains financial benefit from Chitter's activities.

92.    Google's privacy policy overtly informs consumers that Google collects data to "help improve the safety and reliability of [its] service."[39] Google goes on to say that it "uses information like apps you've already installed and videos you've watched on Youtube to suggest new apps you might like."[40]

93.    According to Google, it "use[s] automated systems that analyze your content to provide you with things like customized search results . . . and we analyze your content to help us detect abuse such as spam, malware, and illegal content. We also use algorithms to recognize patterns in data."[41]

94.    Google's Developer Policy states that it will "immediate[ly] remov[e] from its Store Apps that include content that sexualizes minors, including but not limited to, apps that promote pedophilia or inappropriate interaction targeted at a minor."[42] Google goes on to list concrete sexual content and profanity, which, if found to be contained on apps, it

---

[37] *Service Fees*, GOOGLE (2022), https://support.google.com/googleplay/android-developer/answer/112622?hl=en.
[38] *Id.*
[39] Privacy Policy, Google, https://policies.google.com/privacy#infocollect
[40] Privacy Policy, Google, https://policies.google.com/privacy#infocollect
[41] Privacy Policy, Google, https://policies.google.com/privacy#infocollect
[42] Policy Center, Child Endangerment, https://support.google.com/googleplay/android-developer/answer/9878809?hl=en&ref_topic=9877466

would disallow from its Store. The list includes depictions of "sexual nudity," "sexually suggestive poses," "sexual depiction of body parts," and content that has "explicit text, adult/sexual keywords" used "in-app."

95.     According to its statements, Google prohibits apps that feature User Generated Content that contains sexual content and child endangerment material, even if it is incidental to the functions of the app.[43]

96.     Google represents that "Apps that end up being used primarily for hosting objectionable U[ser] G[enerated] C[ontent], or that develop a <u>reputation among users of being a place where such content thrives, will also be removed from Google Play.</u>"[44]

97.     Google Play Store also asserts that it monitors apps and its customers' ratings "based on the app's current quality ratings from user reviews."[45]

98.     Users of Google Play have posted the following reviews and ratings on the Google Play Store regarding Chitter:

- "This is regularly used to trade child p[or]n." This review received a boost from 51 other users.

- "It's just a bunch of horny people like omegle and chatroulette . . . and there are a lot of minors."

- "in fact probably a paedophile, considering the message they sent me."

---

[43] Policy Center, User Generated Content, https://support.google.com/googleplay/android-developer/answer/9876937?hl=en&ref_topic=9877466 ("Incidental Sexual Content – Sexual content is considered "incidental" if it appears in a UGC app that (1) provides access to primarily non-sexual content, and (2) does not actively promote or recommend sexual content. Sexual content defined as illegal by applicable law and child endangerment content are not considered "incidental" and are not permitted.")

[44] Policy Center, User Generated Content, https://support.google.com/googleplay/android-developer/answer/9876937?hl=en&ref_topic=9877466.

[45] Ratings & Review on the Play Store,  https://play.google.com/about/comment-posting-policy/

24



99. Google also developed customized search tools that recommend the app Chitter to Google Play users. For example, when a user is browsing for "anonymous new people" apps, Google Play may recommend the app Chitter to a user as one of the top 7 apps listed despite its reputation as a haven for child sex predators.



[Image: Google Play Customized App Search Result for
Search Term "Anonymous new people"]

25

100.    Although Google overtly represents it is collecting user data; analyzes current reviews to detect illegal content, and concretely states it would remove apps that host user generated content that contain child abuse and sexually explicit conduct; and despite its awareness of user reviews posted on Google's App Store that warn, inform, and elevate concerns about CSAM distribution and child sexual exploitation happening on Chitter, Google continues to sell and recommend the app to users using its analytics system, sales platform, and customized search results.

101.    All the while, Google derives financial benefit and has a continuous business relationship with Chitter, by taking commission from its in-app purchases through Google Play and by collecting data from Google's users that translates to advertisement profit and data revenue.

## **PARTIES**

102.    Plaintiff, L.W. through her legal guardian Jane Doe, brings this action, on behalf of herself and similarly-situated putative class members ("Plaintiff Class" or "Class"). At all relevant times, Plaintiff L.W. was a resident and a citizen of California and resides in San Diego where the alleged harms took place. Plaintiff L.W. brings this suit on behalf of herself and all other similarly situated minor users of Defendants' apps that comprise the putative Class, and brings this class action against each and all of the Defendants.

103.    Plaintiff L.W. and her legal guardian Jane Doe requests that this Court permit her to proceed under a pseudonym ("L.W." and "Jane Doe" respectively). If required by the Court, she will seek permission to proceed under the pseudonyms. The use of pseudonyms are necessary to preserve privacy in a matter of sensitive and highly personal nature given that the allegations detailed herein relate to Plaintiff's experience as a victim of child sex trafficking and child pornography. Plaintiff's sensitive and personal experiences were not the result of any voluntary undertaking on her part, and neither the public, nor the Defendant, will be prejudiced by Plaintiff's identity remaining private.

104.    Defendant Snap Inc. is a Delaware Corporation with its principal place of business in Santa Monica, California, doing business in California as Snapchat Inc.

*L.W. v. Snap Inc. et al.* – COMPLAINT

105.   Defendant Apple Inc. is a California corporation with its principal place of business in Cupertino, California. Apple owns and operates the Apple App Store, including contracting with all app developers that distribute their apps through the App Store.

106.   Defendant Google LLC is a Delaware limited liability company with its principal place of business in Mountain View, California. Google LLC contracts with all app developers that distribute their apps through the Google Play Store and is therefore a party to the anti-competitive contractual restrictions at issue in this Complaint.

## JURISDICTION AND VENUE

107.   This Court has diversity jurisdiction over this class action pursuant to 28 U.S.C. § 1332(d)(2) because the matter in controversy, exclusive of interest and costs, exceeds $5,000,000 and is a class action in which some putative members of the Class may be citizens of states different from the states where Defendants are citizens.

108.   This Court has federal question jurisdiction over Trafficking Victims Protection Act ("TVPRA"), 18 U.S.C. § 1595(a), permitting "an individual who is a victim of a violation of this chapter" to bring a civil action in "an appropriate district court of the United States."

109.   Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because it is where Plaintiff L.W. resides and many of the acts and transactions giving rise to this action occurred in this District as Defendants are: (a) authorized to conduct business in this District and has intentionally availed itself to the laws and markets within this District through the promotion, marketing, distribution and sale of its products in this District; (b) currently conducting substantial business in this District; and (c) are subject to personal jurisdiction in this District.

## CLASS ACTION ALLEGATIONS

110.   Plaintiff brings this class action on behalf of herself and Class Members pursuant to Rule 23 of the Federal Rules of Civil Procedure.

111.   Plaintiff seeks to represent a "Snapchat Class" defined as follows: All United States residents who are or were registered users of Snapchat between May 2, 2012 and the

date of judgment in this action, who were under the age of 18 when they appeared in a video or image that has been uploaded or otherwise made available for viewing by transmission to another user on Snapchat, excluding Defendant, Defendant's officers, directors, and employees, Defendant's subsidiaries, the Judge to which this case is assigned and the immediate family of the Judge to which this case is assigned.

112.   Plaintiff additionally seeks to represent an "Apple Class" defined as follows: All United States residents who, between May 2, 2012 and the date of judgment in this action, were under the age of 18 when they appeared in a video or image that has been uploaded or otherwise made available for viewing on a Computer Application sold or listed for download on Apple's App Store, excluding Defendant, Defendant's officers, directors, and employees, Defendant's subsidiaries, the Judge to which this case is assigned and the immediate family of the Judge to which this case is assigned.

113.   Plaintiff additionally seeks to represent a "Google Class" defined as follows: All United States residents who, between May 2, 2012 and the date of judgment in this action, were under the age of 18 when they appeared in a video or image that has been uploaded or otherwise made available for viewing on a Computer Application sold or listed for download on the Google Play Store, excluding Defendant, Defendant's officers, directors, and employees, Defendant's subsidiaries, the Judge to which this case is assigned and the immediate family of the Judge to which this case is assigned.

114.   Plaintiff reserves the right to re-define any of the Class definitions prior to class certification or thereafter, including after having the opportunity to conduct discovery.

115.   Plaintiff is a member of the putative class that she seeks to represent.

116.   The definition of the putative class is narrowly tailored to include only persons who can be identified through Defendants' database of registered users for the appropriate statutory limitations period through the date of judgment in this action.

### *F.R.C.P. 23(a)*

117.   The proposed class is so numerous that the individual joinder of all its

28

members, in this or any action, is impracticable. The exact number or identification of the members of the putative class is presently unknown to Plaintiff, but it is believed to comprise millions of United States residents throughout the nation, thereby making joinder impractical.

118.    Common questions of fact and law exist as to all Class Members. These include, but are not limited to, the following:

*As to Class Claims against Defendant Snap*

(a)  Whether Snap's implementation of CSAM detection technologies including CSAI Match were a poor fit for its platform such in that it fails to prevent sexual grooming and alert new, previously unknown CSAM;

(b)  Whether Snap's representation of CSAM detection technologies and its purported rationale of collecting various user data for purposes of combatting CSAM distribution and sexual crimes against children were untrue, misleading, and deceptive;

(c)  Whether Snap knew or should have known about the online child sexual grooming on Snapchat and CSAM distribution;

(d)  Whether Snap received financial benefit by engaging in a trade of valuable goods with users who committed sexual crimes against children on Snapchat;

(e)  Whether Snap failed to carry out their stated guidelines, terms of use, and privacy policy related to detection and prohibition of CSAM distribution and online sexual grooming of children;

(f)  Whether Snap's conduct resulted in harm to Plaintiff and Class members;

*As to Class Claims against Defendant Apple*

(g)  Whether Apple's recommendation algorithm and app monitoring analytic tools were defectively designed so as to steer users to apps that foster CSAM distribution;

(h)  Whether Apple's representation and purported reason for collecting various user data (i.e. combatting CSAM and sexual crimes against children) were untrue,

29

misleading, and deceptive;

(i) Whether Apple knew or should have known about online child sexual grooming and CSAM distribution on apps sold and downloaded from the App Store;

(j) Whether Apple received financial benefit by engaging in a trade of valuable goods with users who committed sexual crimes against children;

(k) Whether Apple failed to carry their stated app store guidelines, terms of use, and privacy policy related to detection and prohibition of CSAM distribution and online sexual grooming of children;

(l) Whether Apple's conduct resulted in harm to Plaintiff and Class members;

*As to Class Claims against Defendant Google*

(m) Whether Google's customized search tool algorithm and app monitoring analytic tools were defectively designed so as to steer users to apps that foster CSAM distribution;

(n) Whether Google's representation and purported reasons for collecting various user data (i.e. user protection from illegal CSAM and sexual crimes against children) were untrue, misleading, and deceptive;

(o) Whether Google knew or should have known about child sexual grooming and CSAM distribution on apps sold and downloaded from Google Play Store;

(p) Whether Google received financial benefit by engaging in a trade of valuable goods with users who perpetrated sexual crimes against children;

(q) Whether Google failed to carry out their stated guidelines, terms of use, and privacy policy related to detection and prohibition of CSAM distribution and online sexual grooming of children;

(r) Whether Google's conduct resulted in harm to Plaintiff and Class members; and

(s) Whether Plaintiffs and the Class members are entitled to an injunction, damages, restitution, equitable relief and other relief deemed appropriate and the amount and nature of such relief as to each and every Defendant.

119.    Plaintiff's claims are typical of the claims of the putative class members.

30

Plaintiff and all putative Class members were subject to the above misrepresentations made by Defendants and all have claims based on the same legal theories against the Defendants.

120.    The factual bases of Defendants' misconduct are common to Plaintiff and the putative Class members and represent a common scheme and pattern of practice resulting in injury to all putative class members alike. Plaintiff is asserting the same rights, making the same claims, and seeking similar relief for themselves and all other putative class members.

121.    Plaintiff is an adequate representative of the proposed class because she is a putative class member and does not have interests that conflict with those of the other putative class members they seek to represent.

122.    Plaintiff is represented by experienced and able counsel, who have litigated lawsuits of this complexity, and Plaintiff's Counsel intends to prosecute this action vigorously for the benefit of the proposed class. Plaintiffs and Plaintiff's Counsel will fairly and adequately protect the interests of the class members.

### *Plaintiffs' Class Seeks Certification under F.R.C.P. 23(b)(3)*

123.    The following issues, both legal and factual, are common to this litigation: (1) the defect in Defendants' services and products which failed to provide the minimum amount of safety for users from the foreseeable harms of CSAM distribution and illegal sexual crimes against children, (2) Defendants' misrepresentations about their tools developed to combat CSAM and other illegal sexual crimes against children, and (3) Defendants' liability under TVPRA.

124.    A class action is the superior method available for the efficient adjudication of this litigation because: (a) The prosecution of separate actions by individual members of the Class would create a foreseeable risk of inconsistent or varying adjudications which would establish incompatible results and standards for Defendant; (b) Adjudications with respect to individual members of the Class would, as a practical matter, be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their own separate interests; (c) Class

action treatment avoids the waste and duplication inherent in potentially thousands of individual actions, and conserves the resources of the courts; and (d) the claims of the individual class members may be relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for the members of the Class to individually seek redress for Defendant's wrongful conduct. Even if the members of the Class could afford individual litigation, the court system could not. Moreover, this action is manageable as a class action. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

### *Plaintiffs' Class Seeks Certification under F.R.C.P. 23(b)(2)*

125.    A class action for injunctive and equitable relief pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure is also appropriate. Defendants acted or refused to act on grounds generally applicable to the Class thereby making appropriate final injunctive and equitable relief with respect to the Class as a whole. Defendants' actions are generally applicable to the Class as a whole, and Plaintiffs, on behalf of the Class, seeks damages and injunctive relief described herein. Moreover, Defendants' systemic policy and practices make declaratory relief with respect to the Class as a whole appropriate.

### FIRST CAUSE OF ACTION : STRICT LIABILITY PRODUCT DESIGN AND DEFECT

(Plaintiff on behalf of Class Against All Defendants)

126.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

127.    At all times relevant to this action, Defendants were manufacturers, distributors, and or retailers of the services it provided to consumers.

32

128.     A manufacturer, distributor, or retailer is liable in tort if a defect in the manufacture or design of its product causes injury while the product is being used in a reasonably foreseeable way. *See Soule v. General Motors Corp.* 8 Cal.4th 548, 560 (1994).

129.     "[A] product is defective in design either (1) if the product has failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner, or (2) if, in light of the relevant factors . . . , the benefits of the challenged design do not outweigh the risk of danger inherent in such design." *Barker v. Lull Engineering Co.*, 20 Cal.3d 413, 418 (1978).

130.     The consumer expectation test, is not whether the product, when considered in isolation, is beyond the ordinary knowledge of the consumer, but whether the product, in the context of the facts and circumstances of its failure, is one about which the ordinary consumers can form minimum safety expectations." *Pannu v. Land Rover NorthAmerica, Inc.* 191 Cal. App. 4th 1298, 1311–12 (2011).

131.     Defendant Snap's platform is highly sought after by perpetrators who use Snapchat to engage in 1:1 chat with minors and thereby manipulate those minors to produce and transmit new, previously unknown CSAM. Victims of sexual grooming are often unlikely to self-report. Thus, Snap's implementation of CSAM detection systems such as PhotoDNA and CSAI Match is a poor fit for Snap's systems and has failed to protect minors like L.W. from egregious harm.

132.     Defendant Snap's announcements to implement safety measures in response to senators' and parents' organization's concerns regarding sexual grooming set minimum safety expectations that made ordinary consumers believe it would protect minors from egregious harms like the ones suffered by L.W. Yet, those safety measures are not effective to prevent the foreseeable and known harms of sexual grooming and Snap failed to perform its intended function.

133.     Defendant Apple overtly states that it is managing and gaining information about apps sold on the App Store by aggregating and analyzing information from its users and app ratings by consumers. Apple also develops and uses a recommendation tool, which

33

1   is based on aggregation of user data and recommends apps through its "You might also

2   like" recommendation function. Apple further states that it has a system of collecting user

3   input and ratings to "keep[] an eye out for kids" and that it would "reject apps that

4   perpetuate child abuse."

5       134.   The system that Apple has developed – namely its algorithmic

6   recommendation tool and data aggregation/analytics system – fails to serve its intended

7   function.  Despite numerous ratings and reviews by users that alert Apple about CSAM

8   manifesting in Chitter app, Apple's recommendation tool still suggests Chitter to App Store

9   users. Its analytics and algorithms have failed to aggregate user data and app ratings "to

10  make better recommendations" and to control quality of apps sold on the Apple App Store.

11  These tools and algorithms failed to serve its intended function; had these tools worked,

12  Chitter, an app known to be filled with CSAM would be rejected by the Apple App Store.

13  Due to defects in its functions, minors like Plaintiff continue to suffer harm from CSAM

14  distribution.  Hence, Apple is strictly liable for design defects in its services.

15      135.   Defendant Google overtly states that has developed "automated systems" and

16  "algorithms to recognize patterns in data" to provide "customized search results" and to

17  "detect illegal content." Based on Google's representations, user expect that Google would

18  immediately remove apps that include "content that sexualizes minors, including but not

19  limited to, apps that promote pedophilia or inappropriate interaction targeted at a minor."

20  Google also states that it takes user data, reviews and ratings to monitor the app's current

21  quality ratings.  Google concretely represented that apps that are used for CSAM

22  distribution or that develop a reputation among users for featuring CSAM would be

23  removed from Google Play store.

24      136.   The automated system(s) that Google has developed – namely its customized

25  search tool and data aggregation/analytics system – fails to serve its intended function and

26  is thus defectively designed. Despite numerous ratings and reviews by users that alert

27  Google about CSAM distributed on Chitter, Google's automated system that takes user

28  data to create a customized search tool still suggests Chitter to users in the top of the list of

34

apps. Google's app quality monitoring analytics and algorithms have failed to undertake quality control, because apps like Chitter are known for CSAM distribution and have developed a reputation for same, yet it is still sold and downloadable on Google Play Store. Google has thus failed to prevent the foreseeable and known harms of selling CSAM on its Store, and the automated systems and algorithms it developed for app quality monitoring and user protection failed to perform its intended function. Google Play's defective services continue to harm minors like Plaintiff. Hence, Google is strictly liable for its defectively designed services.

137.     Plaintiff and Class members are entitled to the full extent of compensatory damages including personal and emotional injury (both general and special damages for costs of required medical care) and punitive damages in an amount that the jury may determine fair and reasonable.

## SECOND CAUSE OF ACTION: NEGLIGENCE AND NEGLIGENCE PER SE PRODUCT DESIGN AND DEFECT

### (Plaintiff on behalf of Class Against All Defendants)

138.     Plaintiffs incorporate each and every allegation set forth above as if fully set forth herein.

139.     Based on allegations articulated under paragraphs 126-137, Defendants are also liable under negligence and negligence per se theories for selling defectively designed services.

140.     All Defendants owed a duty of care (negligence) to Plaintiff and Plaintiff Class to exercise reasonable care to prevent foreseeable and known harms such as CSAM distribution and online sexual grooming of children.

141.     All Defendants owed a duty of care (negligence per se) to Plaintiff and Plaintiff Class, not to violate laws prohibiting distribution of CSAM distribution and sexual grooming of children such as the TVPRA (see supra, Seventh Cause of Action) and to

35

exercise reasonable care to prevent foreseeable and known harms from CSAM distribution and sexual grooming of children.

142.    All Defendants breached this duty by providing defectively designed services, tools and products to Plaintiff and Plaintiff Class that render no protection from the known harms of CSAM distribution and online sexual grooming of children.

143.    Defendants' breach of duty was the proximate cause of the harm suffered by Plaintiff and Plaintiff Class.

144.    Plaintiff and Class members are entitled to the full extent of compensatory damages including personal and emotional harm (both general and special damages for costs of required medical care) and punitive damages.

## THIRD CAUSE OF ACTION : CALIFORNIA BUSINESS AND PROFESSIONAL CODE §§17200 & 17500 ("UCL & FALSE ADVERTISING" )

(Plaintiff on behalf of Class Against All Defendants)

145.    Plaintiffs restate each and every paragraph of this Complaint as if fully rewritten herein.

146.    Plaintiffs on behalf of a Class allege claims under California Business and Professional Code §§17200 & 17500 *et seq*. ("UCL & False Advertising"). The UCL and False Advertising laws prohibit unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by California Bus. & Prof. Code §§17200 and 17500 *et seq*.

147.    Defendant Snap has created an environment that is conducive to CSAM distribution and online sexual grooming of children, yet Snap declared that it has set up protection systems to counter it. However, the technology that Snap implemented is a poor fit for the design of Snapchat platform, and despite knowing this, Snap it is still enabling criminals and gaining financial benefit from the multitudes of criminal and illegal activities as articulated in allegations set forth in this Complaint. Snap also explicitly represents that

36

it collects various user data for purposes of enhancing security and to provide protection of users from actions that violate Snap's community guidelines (including sexual harassment and illegal activity), but instead, Snap uses the various user data for advertisement profit and other revenue generation. Hence, Defendant Snap's business activities are unfair and deceptive.

148.    Defendants Apple and Google each state in its store policies and guidelines that it aggregates data and user information to provide analytics, automated recommendation tools, and customized search tools to provide better personalized services for its users. Despite collecting various types of valuable user information and data that translate to profit for Apple and Google, the Apple App Store and Google Play both steer and enable users to download apps like Chitter known as channels for CSAM distribution. It also clearly states that apps that contain CSAM would be rejected and removed, yet, despite numerous customer reviews reporting CSAM distribution on Chitter, Apple's and Google's app stores still allow the Chitter app to be sold and downloaded, and they benefit from users' downloads and purchases on Chitter. Therefore, Apple's and Google's business activities are unfair and deceptive.

149.    A reasonable user would have relied on Defendants' misrepresentation to the user's detriment.

150.    Pursuant to Cal. Bus. & Prof. Code §17200 and 17500 *et seq*., Plaintiff and the putative Class seek an order enjoining the above-described wrongful acts and practices of the Defendants and for restitution and disgorgement.

### **FOURTH CAUSE OF ACTION : FRAUDULENT MISREPRESENTATION & NEGLIGENT MISREPRESENTATION**

(Plaintiffs on behalf of Class Against all Defendants)

151.    In California, "[t]he general elements of a cause of action for fraudulent misrepresentation are (1) misrepresentation (false representation, concealment, or

37

nondisclosure); (2) knowledge of falsity (scienter); (3) intent to induce reliance; (4) justifiable reliance; and (5) resulting damage." *Vogelsang v. Wolpert*, 227 Cal. App. 2d 102, 109 (Ct. App. 1964).

152.   In California, the elements of negligent misrepresentation are "(1) a misrepresentation of a past or existing material fact, (2) made without reasonable ground for believing it to be true, (3) made with the intent to induce another's reliance on the fact misrepresented, (4) justifiable reliance on the misrepresentation, and (5) resulting damage." *Ragland v. U.S. Bank Nat. Assn.*, 209 Cal. App. 4th 182, 196 (2012).

153.   As mentioned in the foregoing paragraphs, all Defendants made concrete representations about its services and tools to protect users from illegal activities including child sexual grooming activities and/or CSAM distribution. Defendants' statements intentionally or negligently misled users to believe that their services provided the protection necessary to avoid harms related to child sexual grooming and CSAM distribution.

154.   A reasonable user would have relied on Defendants' misrepresentation to the user's detriment.

155.   Plaintiff and Class members seek compensatory and punitive damages and all other forms of relief permitted under this cause of action, in the amount that the jury may determine fair and reasonable.

## FIFTH CAUSE OF ACTION : UNJUST ENRICHMENT

### (Plaintiffs on behalf of Class Against all Defendants)

156.   Plaintiffs, individually, and on behalf of all others similarly situated, adopt and incorporate by reference all allegations contained in the foregoing paragraphs as though fully set forth herein.

157.   Plaintiffs, and the putative Class, conferred a tangible economic benefit upon Defendants by signing up as users and giving up personal data and information in

consideration for using Defendants' service, which services include protection from CSAM distribution and online sexual grooming. Defendants specifically represented in their policies that they would collect user data to monitor and detect unlawful and inappropriate content like CSAM that runs afoul their policies and laws. Instead, Defendants were enriched by their collection of minor users' data and selling it for advertisements and other profitable uses. Plaintiffs received no benefit in exchange and was exposed to harm as a result.

158.    Through the profits gained by the sale of personal and non-personal information of users and other purchases facilitated on the apps, Defendants reaped profit from its defectively designed products and services, misrepresentations and deceptive trade practices, and gained financial benefit from illegal trafficking.

159.    Under the circumstances, it would be against equity and good conscience to permit Defendants to retain the ill-gotten benefits that they received from Plaintiffs and members of the putative class.

160.    It would thus be unjust and inequitable for Defendants to retain the benefits reaped from Plaintiff and Class members. Plaintiff and Class members are entitled to restitution or disgorgement of valuable goods (e.g., personal data, in app purchases and more) provided to Defendants, or such other appropriate equitable remedy as appropriate, to the Plaintiff and other members of the putative Class.

## SIXTH CAUSE OF ACTION : INJUNCTIVE RELIEF

### (Plaintiff on behalf of Class Against All Defendants)

161.    Plaintiff, individually, and on behalf of all others similarly situated, adopts and incorporates by reference all allegations contained in the foregoing paragraphs as though fully set forth herein.

162.    Defendants have refused to act on grounds generally applicable to the injunctive relief sought by Plaintiffs and other members of the putative class, thereby

39

making final injunctive relief appropriate.

163.    Defendants' conduct, as more fully set forth herein, both in the past and through the present, demonstrated a willful disregard for the health and safety of minors and the public and constitutes misrepresentations and deceptive trade practices.

164.    If Defendants continue with these practices, consumers, including the Plaintiffs and the putative classes will be irreparably harmed in that they do not have a plain, adequate, speedy, or complete remedy at law to address all of the wrongs alleged in this Complaint, unless injunctive relief is granted to stop Defendants' improper conduct.

165.    Plaintiff and the putative Class members are therefore entitled to an injunction requiring Defendants to carry out and implement the actions it has set forth in its own policies and come into compliance with relevant laws as set forth in this Complaint.

## SEVENTH CAUSE OF ACTION: TRAFFICKING VICTIMS PROTECTION ACT, 18 U.S.C. §§ 1591, 1595 ET SEQ.)

(Plaintiff on behalf of Class against All Defendants)

166.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

167.    Under the TVPRA, "(a) Whoever knowingly— (1) in or affecting interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States, recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or (2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1), knowing, or, except where the act constituting the violation of paragraph (1) is advertising, in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act, shall

40

be punished as provided in subsection (b). 18 U.S.C. §1591(a).

168.    Under §1595(a), not only perpetrators, but also "whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter" is held civilly liable.

169.    Defendants knowingly used the instrumentalities of interstate commerce to violate 18 U.S.C. § 1595.

170.    Defendant Snap Inc. knowingly benefits financially from users who use its platform to sexually groom minors and transmit CSAM materials.

171.    Defendant Snap Inc. maintained a continuous business relationship with users like B.P. whereby Snap Inc. provides access to Snapchat platform and users, in consideration for collecting data which translates into advertisement profit and other revenue generation. Because each user is worth and average $31 in North America, Snapchat gained financial benefit from serving users like B.P. while he committed sexual crimes against children on its platform.

172.    Defendant Snap Inc. created and maintained the perfect environment for online sexual grooming, for example, through the ephemeral messaging feature which created a sense of impunity and allowed perpetrators to hide from parental monitoring. Defendant Snap belatedly implemented technology like Photo DNA and CSAI Match, but it knew that these were inadequate to detect new CSAM generated through online sexual grooming on Snapchat. As such, Defendant Snap Inc. attracted, solicited, and patronized the activities of users like B.P. who "solely used Snapchat" as his platform of choice to groom minor victims and distribute new CSAM. Defendant Snap Inc. intentionally made it easy for users like B.P. to perpetrate crimes on Snapchat.

173.    Defendant Snap Inc. knew or should have known that the videos and images featured on their websites depicted CSAM. Defendant Snap was repeatedly made aware of CSAM distribution and child sexual grooming on its platform by victim's complaints, third-party reporting, advocacy groups, and government investigations. Defendant Snap

41

knew or should have known that its websites are known for child sex trafficking based on all of this information.

174.     Defendants Apple and Google each derive financial benefit and have a continuous business relationship with Chitter, by taking commissions from in-app purchases and by gaining data from their digital stores' and Chitter's users that they collect for advertisement and data revenue. Using its recommendation algorithms based on the analytics of customers' data, reviews, and ratings of apps, Defendants recommend, advertise, and steers customers to Chitter, by displaying it as a top app on search, and by suggesting that a customer "may also like" Chitter.

175.     Defendants knew or should have known that CSAM is readily distributed and traded on Chitter, because Defendants were repeatedly made aware of CSAM distribution and child sexual grooming through user reviews and reporting, government and law makers' warnings, and through their own purported monitoring, analysis, and algorithms developed to control the quality and safety of the apps.

176.     Plaintiff thus seeks compensatory and punitive damages on behalf of herself and the Class against all Defendants, jointly and severally, for all injuries sustained as a result of Defendants' violations of the law, in an amount to be proven at trial, including prejudgment interest thereon.

177.     Plaintiff and the Class also seek reasonable attorneys' fees, costs and expenses incurred in this action, including expert fees, and all other remedies that this Court allows.

178.     Plaintiff and the Class seek all forms of injunctive relief to bring Defendants in compliance with the TVPRA.

## **PRAYER FOR RELIEF**

WHEREFORE, the putative representative Plaintiffs, on behalf of themselves and the putative members of the class defined herein, pray for judgment against the Defendants as follows:

A.     For an order certifying this action and/or common issues raised herein as a "Class Action" under the appropriate provision of Federal Rule of Civil Procedure

42

23(a), 23(b)(2) and/or (b)(3); designating Plaintiff as Class Representative; and appointing the undersigned to serve as class counsel.

B.      For notice of class certification and of any relief to be disseminated to all Class Members and for such other further notices as this Court deems appropriated under Fed. R. Civ. P. 23(d)(2);

C.      For an order barring Defendants from destroying or removing any computer or similar records which record evidence related to the claims above.

D.      For an order barring Defendants from attempting, on its own or through its agents, to induce any putative Class Members to sign any documents which in any way releases any of the claims of any Putative Class Members;

E.      For granting declaratory and injunctive relief to Plaintiff as permitted by law or equity, including: enjoining Defendants from continuing the unlawful practices as set forth herein, and directing Defendants to identify, with Court supervision, victims of its conduct so as to pay them compensatory damages, punitive damages, restitution and/or disgorgement of all monies acquired by Defendants by means of any act or practice declared by the Court to be wrongful;

F.      For an award of compensatory damages in favor of Plaintiff and Class against all Defendants, jointly and severally, in the amount exceeding $5,000,000, to be determined by proof of all injuries and damages described herein and to be proven at trial;

G.      Awarding Plaintiff and the Class punitive damages to the extent allowable by law, in an amount to be proven at trial;

H.      Awarding restitution and disgorgement of Defendants' revenues to the Plaintiff and the proposed Class members;

I.      Ordering Defendants to develop and implement effective tools to combat CSAM and online sexual grooming; remove and ban all applications that host CSAM and enable online sexual grooming; and cease misrepresentations regarding the use of user data for purposes of protecting members against harm from CSAM

43

and online sexual grooming; immediately begin investigating instances of CSAM and online sexual grooming enforce its own policies against users who engage in such behavior; and all other forms of injunctive relief that would bring Defendants into compliance with laws under which causes of actions arise in this Complaint;

J.       Awarding Plaintiff and the Class reasonable attorney's fees and costs of prosecuting this action, including expert witness fees;

K.       Awarding pre-judgment and post-judgment interest; and providing such other relief as may be just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby demands a trial by jury for all issues a jury may properly decide and for all of the requested relief that a jury may award.

Dated: May 2, 2022                    Respectfully submitted,

**By:**    /s/ John K. Buche
John K. Buche (Local Counsel)
Byron E. Ma (Local Counsel)
**BUCHE & ASSOCIATES, P.C.**
875 Prospect St., Suite 305
La Jolla, CA 92037

Juyoun Han, Esq. (*seeking pro hac vice*)
Eric Baum, Esq. (*seeking pro hac vice*)
**EISENBERG & BAUM, LLP**
24 Union Square East, PH
New York, NY 10003

*Attorneys for Plaintiffs*

44